## THE KANSAS FARMERS' FIRE INSURANCE COMPANY V. BEN. SAINDON.

1. INSURANCE POLICY — *Future Incumbrances* — *Renewal of Prior Mortgage.* Where an insurance policy provides against future incumbrances, the policy may be avoided if a subsequent incumbrance is created, or if the incumbrances existing at the time of the application for the insurance are materially increased by a new or additional debt, but a mere subsequent renewal of a prior lien or mortgage, with accrued interest, is not an increase of such preëxisting indebtedness or the creation of a new or an additional incumbrance.

2. MORTGAGE *on Realty and Personalty* — *Severable Contract.* Where an insurance policy covers a dwelling house and various classes of personal property, including household furniture, beds, books, etc., describing them separately, and specifies different and separate amounts on the dwelling and on the personal property, as, $1,900 on dwelling, and $600 on furniture, beds, books, etc., such contract is severable, and the execution of a mortgage on the real estate, in violation of a condition of the policy — against subsequent incumbrances on the property insured, in whole or in part — is no defense to an action for the loss of the personal property not incumbered.

*Motion for Rehearing.*

THE facts appear in *Insurance Co. v. Saindon,* 52 Kas. 486, *et seq.*, and in the opinion herein, filed June 9, 1894.

*Stambaugh & Hurd,* for the motion.
*Pulsifer & Alexander,* contra.

*Per Curiam:* Upon the application for a rehearing in this case, it is insisted that this court incorrectly stated in its opinion that "the insurance company issued the policy, and paid Pelletier 25 per cent. for his services." And again: "That having accepted Pelletier's services as solicitor, and having paid him for the same, the company cannot now disown his agency." It appears from the policy of insurance that the premium was $37.50. John E. Bonebrake, the

president of the insurance company, testified on the trial as follows:

"Ques. What amount of net premium was received by the Kansas Farmers' Fire Insurance Company for this policy, which was issued by the defendant company to Ben. Saindon, the plaintiff herein? Ans. I suppose the amount mentioned in the application. I will have to examine the books and see, in order to get the exact net amount."

The application referred to by Bonebrake, and attached to the answer, does not state upon its face the amount of the premium, except as follows: "Rate, $1.50." Indorsed on the back of the application, partly in printing and partly in writing, was the following:

> "Written and Sent, 4–9, 1887.
> Application.
> No. 7545.
> Kansas Farmers'
> Fire Insurance Co.
> of
> Abilene, Kansas.
> Ben. Saindon, Applicant.
> Concordia, P. O.
> Cloud County, Kansas.
> Amount of Insurance, $2,500.
> Term, 5 year, 1 1–2.
> First Payment, $9.37.
> Cash to Company, $26.13.
> Premium, $37.50.
> Expires, 1st day of April, 1892.
> E. D. Pelletier, Solicitor."
>
> Agents will leave this blank to be filled by company.

This indorsement clearly shows that the insurance company, when it received and acted upon the application, had notice that Pelletier was acting as soliciting agent. The indorsement also shows that the cash payment to the company was $26.13; opposite to this is the following: "Agents will leave this blank to be filled by company." The premium upon the policy was cash; no note was given. If the premium was $37.50, and the cash to the company $26.13 only, the inference is that Pelletier was paid 25 per cent. for his services. He was not paid anything by Saindon. Pelletier had been a soliciting agent for the company. His agency had expired. He had blank applications of the company left in

his hands. He took and forwarded an application for insurance for Saindon, made out upon one of the blanks of the company, on which his name was indorsed as solicitor. The policy was sent 'to him by the company. He received the premium and delivered the policy, and the entry on the application shows "that the cash paid to the company was $26.13." If the company received only $26.13 in cash, Pelletier received the balance, and the other indorsements on the application do not contradict this. The insurance company, we suppose, filled in on the back of the application the amount actually paid in cash, or the net cash received. After Pelletier delivered the policy to Saindon, the latter returned it to Pelletier to be corrected, but he did not send it back to the company.

. We do not think this court, when it handed down its former opinion, was mistaken in any of the material facts concerning the action of Pelletier, as soliciting agent, in receiving and forwarding the application of Saindon for insurance, or of the cash payment to the company. If Pelletier's agency was limited to this single transaction as soliciting agent for the company, he was the agent of the company for all the purposes of this case, and, if he made false answers, the company cannot avoid the payment of the loss on account of them.

In the former opinion it was said: "It appears from the evidence that the subsequent mortgages were simply renewals of those in existence at the time the policy was issued, with interest." At the time of the first presentation of this case, the various items contained in the renewal mortgages were not referred to in detail or commented upon at very great length. Our examination then led us to believe that the mortgages upon the property taken after the issuance of the policy were merely renewals of the prior existing mortgages. The weight of authority is, that increasing an existing incumbrance, contrary to the terms of the policy, avoids the same. (*Bowlus v. Insurance Co.*, 32 N. E. Rep. 319.)

Since the additional briefs have been filed, we have care-

40—53 KAS.

fully reëxamined all the testimony concerning the mortgages. The insurance policy was written April 1, 1887. At that time the premises were mortgaged to T. B. Sweet for $3,500, and to the First National Bank of Concordia for $4,437; total, $7,937. The mortgage to T. B. Sweet was not paid until March 7, 1889, after the fire of November 1, 1888. The mortgage to the bank was paid July 1, 1887, by the execution of a mortgage to C. E. Sweet for $5,314, and the mortgage for $5,314 to C. E. Sweet was paid March 1, 1888, by the execution of the new mortgage for $6,000 to G. E. Lathrop. At the time of the fire, the premises were mortgaged to T. B. Sweet, for $3,500; to G. E. Lathrop, for $6,000; total, $9,500 — $1,563 more upon the face of the mortgages than when the insurance was written. But a part of this $1,563 was interest which had accrued upon the mortgages. It appears, however, that when the mortgage of $4,437, to the bank, of June 2, 1886, was renewed, on July, 1, 1887, for $5,314, it also included $450 of a note of $650 given by Saindon on the 21st of June, 1887. On that day, he paid $44.37 interest on the note of $4,437. There is no evidence in the record that the $650 note was given to the bank for interest on the mortgages, or either of them.

Upon the trial, Saindon, at one time in the course of his examination, testified "that the renewals were for what he owed the bank, and also that the money he drew from the bank was for the purpose of keeping up interest." But when examined concerning the $650 note which he paid by including a large part of it in the mortgage of $5,314, executed on July 1, 1887, he did not state that it was given to the bank for interest upon the mortgages, but testified, among other things, as follows:

"Ques. You heard Mr. Atwood testify that this $5,314 note, at the time that it was made, took up a $600 note? Ans. Yes, sir.

"Q. And that $450 of the $600 was included in this $5,314 note; you understand that do you? A. Yes, sir.

"Q. You say you do n't recollect what that $650 note was

given for? A. Well, that was given — that was because I was owing him something.

"Q. You don't remember what it was given for? A. Not exactly, to say positive; that $600, you know, what it was given for. That is what I told you before. I don't keep any memorandum, and then when we come to talking about — of course I have a little memory — well, that is the best I can.    ∖

"Q. It was secured by chattel mortgage, was it not? A. Yes, all the notes generally that I got, you know, were secured by chattel mortgages.

"Q. And you can't tell what it was for? A. No, to say one time from another, I guess I can't. As I said before, I didn't keep any memorandum, and of course when that is paid off, well, that is done with it."

It appears that Saindon was engaged in feeding cattle from June 2, 1886, to April 11, 1888, and that he borrowed money from time to time -from the bank with which to buy cattle and feed them; also, that the note of $650 was secured by a chattel mortgage. After the prior and subsequent mortgages had been introduced, it then became incumbent upon Saindon to show the mortgages executed after the policy were not the creation of new debts, or included a new debt, but were merely the renewals of the prior mortgages with interest. It is not shown that the $450 included in the mortgage of July 1, 1887, which was used to pay a part of the $650 note, was any part of the principal or interest of the prior mortgages. Therefore, upon the evidence, the mortgage liens upon the dwelling and real estate were materially increased after the issuance of the policy, and before the fire. This would render the insurance upon the dwelling void, unless, upon another hearing, it were shown by additional evidence that the subsequent mortgages were merely renewals of the prior mortgages with interest; in other words, that there was no creation of a new debt in either of the subsequent mortgages. But this ruling will not avoid the payment of the loss upon the personal property. The condition of the policy which the company claims to have been broken reads: "If the property be

1. Insurance policy—future incumbrances —renewal of prior mortgage.

sold or transferred or incumbered, in whole or in part, . . . in every such case this policy is void."

A separate valuation was placed in the policy upon the different subjects of insurance, as $1,900 on the dwelling house and $600 upon the personal property, including the household furniture, beds, wearing apparel, books, etc. It was decided in *Insurance Co. v. Ward,* 50 Kas. 346, that, " Where a policy of insurance is so written as to place separate valuations upon different subjects of insurance, the contract

*2. Mortgage on realty and personalty— severable contract.*

is severable, and a breach of the contract only affects the insured property which is the immediate subject of the act of alienation." (See, also, *Insurance Co. v. York,* 48 Kas. 489; *Insurance Co. v. Fairbank,* 49 N. W. Rep. 711, and cases cited. The policy of insurance being severable, it admits of being separately executed.

The judgment formerly rendered by this court will be modified as follows: The judgment of the district court will be reversed and a new trial awarded, unless the plaintiff below shall, within 30 days, file in writing a remittitur of the judgment in the court below for $1,900, loss on the house, with $124.76 as interest thereon. If such remittitur is filed, the judgment of the district court will be affirmed for $600, for loss of personal property, with interest.